All right. You may proceed. Good morning, Your Honors. My name is Reuel Walker, representing Plaintiff and Appellant Lindsay Focht, and I request to reserve four minutes for rebuttal. Your Honors, this appeal is a de novo review of the district court's decision that it could not assert general personal jurisdiction against Defendant Sol Melia S.A. How much does our resolution of this case depend on what the Supreme Court does with Daimler v. Bauman? I listened to that argument the other day, and it struck me that it might. Your Honor, the Daimler v. Bauman is about the de novo review. Well, that's the case in the Supreme Court. Yes, yes. I'm sorry. If it becomes a discretionary decision, then a different analysis. Are you familiar with Daimler v. Bauman? I had it as a citation. I wasn't aware that it was up for the Supreme Court. Sorry. It is. Okay. I'm sorry. I'd be glad to address that in a letter brief, if that's okay with the Court. Your Honors, there is a clear legal doctrine, however, the representative service doctrine that allows the court to do that. I think maybe Judge Trout's question was, should we wait for that case? So if you want to think about that and maybe answer that in rebuttal, then. Okay, fine. I will. Thank you. That allows the Court to do that. There is a clear legal doctrine, the representative services doctrine, that allows this Court to achieve the just result of allowing this badly injured plaintiff to have her day in court against the large and very complexly organized international corporation that ultimately owns and controls the hotel whose employees caused her injuries. Without the application of this doctrine, we face the irony that the larger this international corporation becomes and the more its hotel operations and sales spread around the world through a complex and layered net of subsidiaries, the more likely it is to be effectively immune from liability anywhere other than its own domicile, including in countries such as Mexico and the islands of the Caribbean, where it has most of its hotels, and even for something as personal as staying overnight in a room and using the services of a resort. There will be no effective remedy for a plaintiff in this situation, and that can be expected to grow as corporations become larger and more international and more layered in their structure. What's your best case, I mean, that you have that's, I guess, similar to your situation here, where a corporation was more or less equivalent to the sole milia with respect to the proportion of its revenue attributable to the foreign State and the proportion of its marketing and other business activities directed at that foreign State? Having trouble finding a case that's equivalent, but I'd like to hear from you on that. I understand, Your Honor. Yes, if we accept that the substantiality test requires not only absolute substantial miality in terms of the dollar amount involved, but relative substantiality relative to the total worldwide income of the corporation and relative to the forum, that category of activity in the forum, then I think we probably cannot prevail, because as the district court observed, it's point the $9 million is .74 percent, and I certainly couldn't find any case that low. I challenge, though, whether that makes sense. So, but what's the authority? I mean, I appreciate your challenging that. It's always interesting. I know. But we're guided by precedent and authority, and I'm just curious to understand your theory, because it's more of a theory that you're presenting than an appeal. I understand, Your Honor. Well, I suppose I am branching into a new analysis of that particular question in that, for instance, I pose the hypothetical of two different corporations which have continuous and systemic contacts, both that meet that element, but one has a very low percentage because they have huge sales outside of California, and the other is a relatively modest corporation, foreign corporation, so that it meets that standard. The contacts with California are exactly the same, and yet one California could assert personal jurisdiction against one and not against the other. To my mind, that makes no sense at all, and I question the application, and I don't have an authority for that, obviously, because there is some authority indicating, I don't know that it squarely holds that both elements are essential. There is the Eighth Circuit case, Lakin versus Prudential Securities, where they held that the percentage is not relative. It's not relative to the total sales, and I would argue that that is the better analysis, but for the hypothetical illustrating the problem with that holding. But even following, I guess, Lincoln, help me understand how that would help you here. Well, if the relative substantiality of the contacts with California relative to total global sales is not a problem, then we have 11.1 million in sales to California citizens, 200,000 hotel stays, and the Silk Air case and the KLM case, both are within, were within the jurisdiction that was found in those cases, and those are California Court of Appeal cases, holding that in the Silk Air case, the revenue was 1.43 million, and the Supreme Court of California said that that was, they, pardon me, in that case, the Supreme Court of California directed the Court of Appeal to issue an alternative writ and hear the case, and then the Court of Appeal found that that was substantial. In the KLM case, the Supreme Court of California later, that was a case involving purchases of about 1 million a year, and in that case, the Supreme Court of California later cited that case and said that was a substantial amount. So California law indicates that something in the realm of 1 or 2 or 3 million dollars is substantial. And we, in this case, we have 11.1 million and 200,000 hotel stays by California residents. The only problem is the relative substantiality requirement, if it's applied in this case. And as I have said, I don't see the logic behind that requirement, if, based on the hypothetical that I put in my brief. And I acknowledge that's a problem for our case, but I believe that the logic of that position is, is, is quite solid. How does the loyalty program cut? I'm sorry? The loyalty program. Yes. What does that do for you, if anything? Well, that's, that's an additional number, a dollar, I mean, it's a different number, additional number of California citizens that are marketing and have a relationship with that corporation. So it helps our case. I, we rest it primarily, I mean, the more important dollar figures and the more substantial are the 11.1 million in sales, the 200,000 hotel stays, the two offices in California, the five full-time employees who devote 50% of their time to California. The holding out to the public that it's a single corporation, both on the website and their hotel directory. How does this loyalty program work? How many people in California belong to the loyalty program? I believe there were, just a minute, let me see that. 19,000 members in California and 1,400 travel agents. And is that a continuous relationship between the people who are in this loyalty program? It's a, it's an open-ended relationship. It's not, it's, it's an ongoing relationship, yes. And is it a business relationship? Yes, they receive like frequent flyer miles. Are there any other, any cases that deal with this aspect of, of jurisdiction, whether people in the jurisdiction belong to a loyalty program? Off the top of my head, I'm not aware of those, Your Honor. There, I, I, there are hotel cases. I'm, I'm not aware of whether that factor was played, played and was balanced in there. Your Honors, applying the representative services doctrine to those, to the three distinct groups that we rely on in this case. The first is the hotels themselves. The hotels that are scattered around the world that have sold, that have sold rooms to California citizens. Approximately 200,000 per year and 11.1 million in revenue. There can be little doubt of the importance of those relationships to Somalia in that hotel stays make up approximately 76.3% of its income, of its operating income, for owned and leased hotels. And as I said, that generated 9.3 million. And that it represent, the U.S. represents a very significant market and California represents a very significant part of the U.S. market. The control element is provided by the fact that the financial report for Somalia itself said that the subsidiaries are controlled directly or indirectly in such a way that the latter can direct financial and operating policies with an aim to obtain profit for Somalia. And in addition, the hotels are held out as being a single corporation as shown by the 2009 hotel directory. The opening letter in that directory of Chairman Gabriel Julia refers to it as being a single corporation and a corporate identity for all of the hotels. In addition, the Somalia Press Kit makes a similar reference. And on its own website, Somalia refers to all of the hotels related to activities as being part of a single company. They say Somalia Hotels and Resorts is the world's largest resort hotel company. Somalia includes in the list of brands names, but it says it's a single company. Pardon me a second. Turning to the applying of the representative services doctrine against the Sol Group, SGC, the Somalia Group Corporation. The hotels in the area served by that corporation are all of the advertising and all of the legal services necessary for sales in America are provided by SGC. And the hotels in the area serviced by those, namely Latin America and the Caribbean, account for 28.4% of Somalia's total hotel income. Therefore, it's obviously sufficiently important. And that element of the test is met in this case. You're down to about four minutes. Did you want to reserve? I'll wait. Good morning, Your Honors. May it please the Court. Bernard Galhar on behalf of Eppoli, Somalia. Move the microphone down just a little bit so we can hear you a little bit. Sure, is that better? Yes, thank you. I intend to keep this brief. I probably won't use up all my time. I think the briefs outlined the facts, which are particularly important in this case, and the law, which the parties disagree on only in terms of application to the facts in this case. But I think Judge Trott's question initially highlights the fact that really what we're talking about here is the Bauman case and the application of the agency theory of jurisdiction on Somalia, a Spanish corporation, with, as has been conceded by the appellant, on its own context to the United States, would not – there would be no jurisdiction. It's based solely on the contacts of these various entities that are subsidiaries of subsidiaries or a majority owned by a subsidiary owned by Somalia. Going back to the Bauman case, I think it may have impact on the case. It may not. I think if the court agrees with our position that the district court here was correct in its analysis of the agency theory, then I believe that it doesn't impact it because I think the court should affirm the decision. However, if the court's inclined to overturn or consider the appellant's arguments, I believe that the Bauman case is squarely on point. If you look at the Bauman case, there's much more evidence in terms of the contacts. It's a wholly owned subsidiary of the foreign corporation that's selling physical product into the United States, where almost 3% of the sales in California of automobiles are – you know, that's 3% of the worldwide revenue of Daimler AG. And so given that, if the Supreme Court overturns the Bauman decision, I would – in all likelihood, it will affect this case. Either the agency theory will be no longer viable or it will be restricted to the point where it wouldn't encompass this case on the facts that we have here. So do you think we should wait for it or not? Excuse me? Do you think we should wait for that decision or not? Like I said, I don't think you have to. I think you could, particularly if there's any inclination to examine the facts and consider overturning the district court here. Our position is that the district court was correct under the agency theory, and as the law stands currently, the case should be affirmed. There likely will be a decision in the near future from the Supreme Court, and that may dispose of the case. Yeah, I think it was argued in the first week. Yes, and so it should be decided by June. Rightly or wrongly, I'm somewhat interested in this loyalty program. Tell me how that – I know it's a lesser part of the case at this point, but tell me how that works. Well, it's like a frequent flyer mile type program. And so, you know, if you go back and look at the record, it's not directed at any particular jurisdiction, California in particular. There may be a certain number, but even when Sole Malia was asked to go back – Who are the parties to the loyalty program? Oh, I see what you're – Loyalty to whom? The loyalty program is – well, it's loyalty to the Sole Malia brand, I believe, but the brand itself doesn't – But it's a Sole Malia program. Yes, it is. And so you have – you know, maybe it's a small number of people compared to the total number of people in California, but it still seemed to me to be a substantial number of people who have a continuous business relationship with – Potentially. I mean, it's – you know, you can sign up for frequent flyer mile programs, you know, fly that airline once and still be receiving emails and whatnot. It's not necessarily – as I think as counsel pointed out, it's an open-ended relationship potentially. And what I was going to say was if you go back into the record and look when Sole Malia was asked to identify the number of California participants, it was partially based on – it was a difficult task because they don't necessarily track that, and at one point they didn't even ask what jurisdiction the people were in. And it seems to be as many as 19,000? It's around there. And do those people get emails? They do. From whom? That comes from Sole Malia. And how often does that happen? I believe it would come from the Sole Malia – the Sole group. I would have – I'm not – Does it happen as often as I get emails on my account from people with whom I'm involved in a loyalty program? I don't believe there's anything in the record to that effect. And I think, you know, what we're getting at in part is that the record might be deficient on that issue in terms of establishing the lengths of – you know, the extent of the contact. Do you think it makes any difference or no difference at all that there's this program with this relationship? I don't, because if you – we did cite a federal case, the Rears v. Deutsche Bahn AG case, which is a 320F subsecond, 140. And that there – there's a quote. Accordingly, while New York residents can benefit from ECOR's affiliate program, loyalty programs, internet reservation systems, in partnership with Delta Airlines, those benefits do not result from ECOR's having reached into New York to solicit business there. But from the fact that access to these programs is available to anyone in the United States who seeks them out. And I think if – that is – it may not be exactly the case, but it's similar. And it's – the sense is that this is something that's out there. It's like the reservation system that Somalia has. Are there any emails – loyalty program emails in this record? Not that I recall. I don't recall any either. Not that I recall. It seems that they would be soliciting business in the state from the members. That's what they're all about. In the same way, I think, that the reservation system would. I mean, it's available to anyone and somebody can sign up for it and choose to receive it. It's not – they're not – it's not blind emails, you know, soliciting participation. No, these are customers who want to do business with your corporation and its subsidiaries and you have to contact us directly with the corporation. Exactly. Yeah. But it's an interesting question, as Judge Trump points out, because that's the direct contact. Right. In this sense, as opposed to the indirect contract of the contact with the subsidiaries. It is an interesting question. I do believe, though, that there isn't much in the record about it in terms of the extent of the contact, other than these numbers of people who were members of the program and may have received emails. And, like I said, that was a difficult task to do because it's not really tracked by jurisdiction. It's just, you know, people that choose to receive these emails and get them. On the other hand, once one has signed up for a frequent stay program, then there is direct contact and solicitation. Well, and I would have to check this in the record. Right. But I think that that contact would then be with Sol Group, which handles the marketing side of it. I don't know that it's actually directly from Sol Melillo, the parent company. Okay. And honestly, I don't really have a whole lot else to add. Let me just, I'm curious just to hear what you think would be the bare minimum of additional contact that Sol Melillo would need to have with California in order to exercise personal jurisdiction or for it to be proper. This would be assuming that the agency theory is what we're ultimately operating under. Well, I think you'd have to have something more akin to what you have in the Bauman case. You would not have subsidiaries of subsidiaries that represent multiple entities and only devote partially their time to the foreign corporation. I think you'd have to have something more of an actual presence like Daimler did through MBUSA. They had a corporate office in California. They sold, like I said, 2.7%, I think, of their worldwide sales into California. It was clearly, you know, intentional injection into the commerce of the state, where I don't believe you have that here. You have, you know, one office of a subsidiary of subsidiary with somebody selling corporate events and things like that. And then you have the vacation club and those things that are, again, not directly solely representing Sol Melillo. Any further questions? Thank you. Thank you. Your Honor, just continuing with that line of inquiry, there are not only the frequent users club for the users, but frequent users club for travel agents as well. And that would probably involve direct email solicitation. So what's on the record on that? In SGC, in the discussion of SGC in the, pardon me, SMVC and VCSI, they talk about, in the record, 142, I believe. Let me see just a moment. Let me scan my notes here. And was your client a member of the frequent? No. No, Your Honor, not. In addition, Your Honor, as far as intentional insertion into the market, it's important to remember, again, under the agency doctrine, that Sol Melillo has two offices in California, five employees, full-time employees over the last five years, devoting approximately 50% of their time to sales in California and solicitation of group sales and corporate sales in California. Your Honor, finally, I would like to ask permission to submit a short letter brief about the Byman case just to address that issue, since that was of interest to the Court. Well, let me just, this is a synopsis of the issue, whether it violates due process for a court to exercise general personal jurisdiction over a foreign corporation based solely on the fact that an indirect corporate subsidiary performs services on behalf of the defendant in an informed state, which would seem to be pretty on point. I was going to say, that sounds pretty on point. Right down the middle of the track. All right, fine. Well, I apologize for my not being informed of that, and I would, if your court will allow me, I'll do it within a page or less. I don't think, I think we probably have what we need. If you can submit something if you want to on a 28-J, but I think basically the question before us is probably whether to wait for the case or not, and that's, we'll look at that. If you're curious, you can go on the Supreme Court's website and read and listen to the argument. I will. Thank you very much. Thank you, Mr. Yergin. It's an interesting case, and we'll take it under submission. The case, as heard, will be submitted for decision.
judges: Trott, Thomas, Murguia